**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **WILLIAM J. HUNTER,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:12-CV-1094-M-BK** |
| | § | |
| **ALLIED BARTON SECURITY** | § | |
| **SERVICES and LESLEY VARNER,** | § | |
| **Defendants.** | § | |

<u>**FINDINGS, CONCLUSIONS AND RECOMMENDATION**</u>

Pursuant to *Special Order 3*, this case is before the undersigned for pretrial management. Now before the Court is Defendants' *Motion for Summary Judgment* (Doc. 20).  After reviewing the pleadings and applicable law, it is recommended that the motion be **GRANTED**.

## I. BACKGROUND

William Hunter ("Plaintiff"), an African American man, initiated this *pro se* action alleging that his former employer, AlliedBarton Security Services ("Defendant"), and Defendant's account manager Lesley Varner ("Varner"), violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") by discriminating against him based on his race and retaliating against him for engaging in activity protected under Title VII.  (Doc. 3 at 1-2).  Plaintiff alleges Varner (1) showed preferential treatment to a white supervisor by awarding the supervisor full pay for holidays and half days; (2) discriminated against Plaintiff on account of race after Plaintiff lodged these accusations; and (3) accused Plaintiff of disloyalty and not supporting Varner against other employees.  *Id.*  Plaintiff seeks attorneys' fees, in the event he obtains counsel, back pay, compensatory and punitive damages, and all other appropriate equitable relief.  *Id.* at 2.

Plaintiff testified at deposition that he applied to be a security officer with Defendant on March 10, 2009. (Doc. 20-2 at 22). Upon being hired, he was placed on the Plaza of the Americas account, which was managed by Defendant Lesley Varner. *Id.* at 22-23. Plaintiff testified that he believed he would be hired as a shift supervisor. *Id.* at 22. Varner, also an African American man, knew Plaintiff was black when he interviewed and subsequently hired him. *Id.* Bradley Lamb, a Caucasian man, served as First Shift Supervisor. *Id.* at 24. Shortly after Plaintiff was hired by Defendant, Varner went on medical leave, leaving his position vacant. *Id.* at 23; Doc. 20-5 at 57. In Varner's absence, Lamb performed many of Varner's job duties and started referring to himself as "Assistant to Security Manager." (Doc. 20-5 at 57).

Plaintiff received a favorable performance evaluation, conducted by Varner and Lamb, in June 2010, which noted that Plaintiff's performance was "acceptable" in most areas, but that Plaintiff "needed improvement" in areas that contribute to positive work place morale. *Id.* at 20. During the evaluation, Varner additionally noted that Plaintiff failed to submit two reports in a timely manner. (Doc. 20-2 at 40; Doc. 20-5 at 23). On June 24, 2010, Plaintiff discussed with Defendant's District Manager, James Santti, and Human Resources Assistant, Sajan Thomas, his evaluation and various issues he had at work. (Doc. 20-5 at 23). He discussed with them his interactions with Varner and Lamb, alleging that Varner "harassed [Plaintiff] for trying to carry out the policies and procedures of AlliedBarton and the Equity Office management." *Id.* at 24. According to Plaintiff, Varner believed Plaintiff was "forcing his hand" by attempting to submit to human resources a violation report regarding an employee who had been sleeping on the job. *Id.* Plaintiff also reported his belief that Varner (1) ignored supervisors' write-ups of employees; (2) failed to provide notice of new employee training on the worksite; and (3) gave favorable treatment to hourly paid supervisors. *Id.* at 24.

Lamb submitted his two-week notice to Defendant in October 2010 to accept a management position with another company. *Id.* at 58. Plaintiff subsequently was promoted to First Shift Supervisor on October 29, 2010. (Doc. 20-2 at 26). His duties, which he described as "[t]he same as Bradley Lamb's," included running the first shift, supervising security officers, enforcing the rules and policies of Defendant and Equity Office Management, and directing officers in their duties. *Id.* However, Plaintiff was not given the title Assistant to Security Manager following his promotion. (Doc. 3 at 1). Plaintiff, however, did receive a second pay raise from $10.50 per hour to $12 per hour. (Doc. 20-2 at 26). His pay increased again on April 19, 2011 -- to $13 per hour -- after he made a request to, and received a raise from, Varner. *Id.* at 32-33.

Around the same time as his second raise, Plaintiff took a report from a female security officer, Patricia Major, who alleged that she had been sexually harassed by the Third Shift Supervisor on two occasions in April 2011. *Id.* at 58-59. Plaintiff submitted the report to Varner. *Id.* at 60. Major continued to work for Defendant following the incident and subsequent report. *Id.* at 65.

Plaintiff's employment as First Shift Supervisor was not without difficulties. Varner sent email messages to Thomas and Santti on May 24 and 25, 2011 regarding Plaintiff's behavior in the Plaza of the Americas' work place. (Doc. 23 at 50, 52). Varner claimed that Plaintiff was disruptive. *Id.* at 52. In addition, Varner reported that three security officers, including Major, complained that Plaintiff was angry and intimidating while supervising employees. *Id.* at 54.

Plaintiff and Varner discussed the officers' complaints in a meeting on September 29, 2011. *Id.* Plaintiff claims he first became aware of the complaints at this meeting. (Doc. 20-2 at 73). Varner accused Plaintiff having problems with the other security officers, to which Plaintiff

responded that Varner was the problem.  *Id.* at 75.  The following day, September 30, 2011, while training two employees on a new security system, Plaintiff received a phone call from Varner.  (Doc. 20-3 at 7-9).  Plaintiff avers that after the phone call abruptly ended, he immediately went to Varner's office to explain that the call ended because his phone battery died.  *Id.* at 9.  Varner, however, insisted that Plaintiff hung up on him.  *Id.* at 9.  Afterwards, Plaintiff told Varner that he was going to Santti to report discrimination, and Varner told Plaintiff to leave his office.  *Id.* at 11.  Plaintiff replied, "Don't talk to me that way.  I'm not your son" and left Varner's office.  *Id.*  Plaintiff was suspended that afternoon.  *Id.* at 20.

On the day he was suspended, Plaintiff attempted to contact Varner, Thomas, and Defendant's human resources headquarters in Pennsylvania to determine the reason for his suspension, but did not receive an answer.  *Id.* at 20-23.  Rather, Thomas simply informed him that he was suspended until further notice.  *Id.* at 24.  On October 4, 2011, Thomas asked Plaintiff to prepare a statement regarding the September 29 and 30, 2011 meetings he had with Varner.  *Id.*  The next day, Plaintiff met with Varner, Thomas, and the Vice President of Operations, Michael Cashimere, and Plaintiff learned he was terminated for "gross insubordination or gross misconduct on Company/client premises."  *Id.* at 26-28; Doc. 20-5 at 50.

Plaintiff avers he called Jewel Thurman Jenkins, the regional human resources manager for Defendant, a day or two after his October 5, 2011 termination.  (Doc. 20-3 at 33).  During two conversations -- one in early October and one ten days later -- they discussed Plaintiff's September meetings with Varner and his subsequent termination.  *Id.* at 34-36.  Plaintiff did not receive another call from Jenkins for 97 days.  *Id.* at 36.  In the interim, he attempted to contact the corporate office and the CEO of the company.  *Id.* at 37-39.  He eventually was told by Judy

Raffeto, Defendant's Director of Human Resources, that the company would conduct a "fair investigation" into his termination. *Id.* at 37, 39. Plaintiff was replaced as First Shift Supervisor by Harrison Sneed, an African American man. *Id.* at 41.

On January 10, 2012, Plaintiff filed a charge with the Equal Employment Opportunity Commission (EEOC) against Defendant alleging race discrimination and retaliation that occurred on October 5, 2011. (Doc. 20-4 at 38). The EEOC issued a "right to sue letter" to Plaintiff on January 10, 2012. *Id.* at 22. Plaintiff timely filed this action on April 6, 2012. (Doc. 3).

## II. APPLICABLE LAW and ANALYSIS

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A party moving for summary judgment has the initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotes omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the non-moving party and resolve all disputed facts in favor of the non-moving party. *Id.* However, Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the non-movant's opposition to the motion for summary judgment. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998); *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Ragas*, 136 F.3d at 458. The court applies less stringent standards and liberally construes the briefs of parties proceeding *pro se*. *Haines v. Kerner*, 404 U.S. 519, 520 (1972). Nonetheless, parties proceeding without the assistance of counsel are obligated to brief the issues and reasonably comply with the Federal Rules of Civil Procedure. *See Birl v. Estelle*, 660 F.2d 592, 593 (5th Cir. 1981).

### *Claims against Lesley Varner*

Defendants argue that Plaintiff's claims against Defendant and Varner are brought solely under Title VII. (Doc. 3). However, Plaintiff responds, "[i]ndividual supervisors may be named under Section 1981 (though not under Title VII), if they personally harassed or discriminated against the plaintiff." Plaintiff clearly states in his complaint (Doc. 1 at 1) and his Civil Cover Sheet (Doc. 1 at 4) that his claims are brought under Title VII of the Civil Rights Act. However, because he also cites to Section 1981 in his complaint (Doc. 3 at 2), and is proceeding without the assistance of counsel, the Court liberally construes his response to the motion for summary judgment to argue that he has also asserted claims of discrimination and retaliation against Varner under 42 U.S.C. § 1981.

Title VII precludes discrimination by an employer against an employee on the basis of race. 42 U.S.C. § 2000e-2. However, "individuals are not liable under Title VII in either their individual or official capacities." *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 382 n. 1 (5th Cir. 2003); *see also Smith v. Amedisys, Inc.*, 298 F.3d 434, 448 (5th Cir. 2002) ("This circuit has held that there is no individual liability for employees under Title VII."). Section 1981 proscribes discrimination on the basis of race in making or enforcing a contract, including an employment contract. 42 U.S.C. § 1981, 1981(b); *Miller v. Wachovia Bank*, 541 F.Supp.2d 858, 861 (N.D.Tex. 2008) (Fitzwater, C.J.). Under that section, "[a]n employee who exercises control over the plaintiff with respect to an employment decision may be individually liable if the employee was 'essentially the same' as the employer in exercising this authority." *Miller*, 541 F.Supp.2d at 862-863 (citing *Foley v. University of Houston*, 355 F.3d 333, 337-338 (5th Cir. 2003).

Thus, to the extent that Plaintiff has alleged claims against Varner under Section 1981, they survive this challenge. However, for the reasons detailed subsequently herein, Varner is entitled to summary judgment on the merits as to all of Plaintiff's claims.

### *Administrative Remedies*

Defendants argue that Plaintiff's Title VII claims of racial discrimination are barred because of his failure to exhaust administrative remedies, to-wit, to file discrimination charges within the requisite time period. (Doc. 20-1 at 13). A Title VII plaintiff must file an EEOC charge within 300 days of learning of the alleged unlawful employment action. *O'Neal v. Roadway Exp.*, 181 F. App'x 417, 419 (5th Cir. 2006). Specifically, Defendants contend that Plaintiff's job title and paid time off claims arose in October 2010, and that Plaintiff's EEOC charge filed on January 10, 2012, failed to mention either. *Id.*

> Title VII requires employees to exhaust their administrative remedies before seeking judicial relief. Private sector employees must satisfy this requirement by filing an administrative charge with the EEOC. The charge enables the EEOC to investigate and, if appropriate, negotiate a resolution with an employer. Only after administrative efforts terminate may the employee sue the employer in federal court.

*McClain v. Lufkin Industries, Inc.*, 519 F.3d 264, 273 (5th Cir. 2008) (internal citations omitted). In determining whether a plaintiff has satisfied the administrative exhaustion requirement as to a particular claim, the court examines the plaintiff's EEOC charge to determine if his claim could reasonably be expected to arise from the alleged facts. *Pacheco v. Mineta*, 448 F.3d 783, 792 (5th Cir. 2006).

Here, Plaintiff's January 2012 EEOC charge alleges only discrimination on the basis of race and retaliation, with October 5, 2011 as the date of the alleged discrimination, which is the date his employment at AlliedBarton was terminated. (Doc. 20-4 at 38). Nothing about the allegations in Plaintiff's EEOC complaint suggests he suffered other harm, including being denied a job title or paid time off. Plaintiff claims his job title claim did not arise until after June 2011 when he first noticed that Lamb used the title "Assistant to Security Manager" in an email Lamb sent to a client. (Doc. 23 at 12). That is of no moment, however, as Plaintiff has presented no proof that he <u>ever</u> exhausted his job title claim. The same is true as to his paid time off claim, despite his contention that the matter was implied during May 2011 meetings with Varner and Thomas regarding racial discrimination. *Id.* at 12-13.

Consequently, Plaintiff's claims that he was denied the same job title and paid leave as his white predecessor should be dismissed for failure to exhaust administrative remedies. Notwithstanding Plaintiff's failure to exhaust his administrative remedies as to those two claims, summary judgment is also appropriate on the merits for the reasons discussed below.

***Race Discrimination Based on Title VII and Section 1981***

Employment discrimination claims filed under both Title VII and Section 1981, based on circumstantial evidence, are subject to the burden-shifting analysis provided in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 & n.2 (5th Cir. 1999).  To survive summary judgment on a claim of employment discrimination, the plaintiff first must establish a *prima facie* case that he: (1) is a member of a protected class; (2) was qualified for his position; (3) suffered an adverse employment action; and (4) was replaced by someone outside his protected group or was treated less favorably than similarly situated employees outside his protected group.  *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007).  The burden then shifts to the employer to show a legitimate, non-discriminatory reason for the adverse employment action.  *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003).  If the employer is successful, the burden shifts back to the plaintiff to provide substantial evidence that the proffered reason is a pretext for discrimination.  *Id.*  To constitute an adverse employment action, an action must consist of "*ultimate employment decisions* such as hiring, granting leave, discharging, promoting, and compensating."  *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004) (internal citations omitted) (emphasis in original).

A.  Job Title

Plaintiff has failed to demonstrate that not being given the title of "Assistant to the Security Manager" was an adverse employment action.  Indeed, Plaintiff concedes in his deposition testimony that Lamb's job title was "shift supervisor," as was Plaintiff's upon being promoted to the position Lamb vacated, and that Lamb's title appeared as shift supervisor on official company documents.  (Doc. 20-2 at 42).  Although Varner averred in his affidavit that

Lamb, who is white, occasionally used the title "Assistant to Security Manager," he maintained that Defendants neither bestowed the title upon Lamb nor authorized him to use it. (Doc. 20-5 at 57). Plaintiff has not offered evidence that the job title he complains about ever existed, let alone provided substantial evidence that Defendants' proffered reason for not bestowing the same title on him was a pretext for discrimination. Indeed, in his response, Plaintiff avers that "Lamb's responsibilities were higher and different." (Doc. 23 at 14).

Thus, there is not a genuine issue of material fact as to Plaintiff's claim that he was denied the title of "Assistant to Security Manager" on account of race. Defendants' motion for summary judgment should be granted as to this claim.

B. <u>Paid Leave</u>

Plaintiff complains that he was denied paid time off on holidays, although Lamb had been granted the same. (Doc. 3 at 1-2). He also contends that Lamb was allowed to work half days in the two weeks prior to the end of his employment with Defendants and still receive full pay, but Plaintiff was not afforded the same benefit. *Id.* Defendants counter with evidence that while Lamb still held the position of shift supervisor, he was permitted to work from home on holidays and compensated for that time. (Doc. 20-5 at 58). Subsequently, however, the policy was changed and Lamb was required to be present at the site in order to be paid for hours worked on holidays. *Id.* Thus, the policy Plaintiff complains about was changed during Lamb's tenure and prior to Plaintiff's promotion to the position. Moreover, the uncontroverted evidence is that Plaintiff, unlike Lamb, did not leave Defendant's employ after giving two weeks' notice, but was fired. *Id.* at 58, 60-61.

Based on the evidence, there was no comparison between Lamb and Plaintiff, as they were not similarly situated. *See Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009)

(similarly-situated comparator must have been engaged in conduct "nearly identical" to plaintiff's conduct which led to an adverse employment decision). Plaintiff has failed to show that Defendants' reasons for not giving him paid time off on either holidays or upon his termination were a pretext for racial discrimination. Thus, Defendants should be granted summary judgment on Plaintiff's paid leave claims as well.

C. Retaliation

Plaintiff contends that Defendants retaliated against him by terminating his employment after (1) he wrote a sexual harassment report for a fellow employee; and (2) "inform[ed] female employees how to improve their salaries and that there is a chain-of-command higher than Varner's position." (Doc. 3 at 2). Defendants argue that summary judgment should be granted in their favor because Plaintiff has not shown a causal connection between his protected activity and his termination. (Doc. 20-1 at 18).

Claims of retaliation under both Title VII and Section 1981 are subject to the burden-shifting scheme outlined in *McDonnell Douglas*. *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 468 (5th Cir. 2002). First, the plaintiff must make a prima facie case that meets three elements: (1) the employee engaged in an activity that is protected by Title VII; (2) the employer took an adverse employment action against the employee; and (3) but for the employee's protected activity, the retaliation would not have occurred. *Brazoria County, Tex. v. EEOC*, 391 F.3d 685, 692 (5th Cir. 2004), as modified by *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. ___, 133 S.Ct. 2517 (2013); *see also Foley*, 324 F.3d at 316 (the elements for establishing a prima facie case of retaliation under Section 1981 are identical to those that must be established under Title VII). Under both Section 1981 and Title VII, a "protected activity" is defined as opposition to any practice rendered unlawful by Title VII, including making a charge, testifying,

11

assisting, or participating in any investigation, proceeding or hearing under Title VII.  42 U.S.C.

§ 2000e-3(a); *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996).

      Moreover, in *Nassar*, the Supreme Court recently held that "Title VII retaliation claims

must be proved according to traditional principles of but-for causation, not the lessened causation

test stated in § 2000e-2(m)," requiring "proof that the unlawful retaliation would not have

occurred in the absence of the alleged wrongful action or actions of the employer."  *Nassar*, 570

U.S. ___, 133 S. Ct. at 2533.  If a plaintiff fails to prove or raise an issue of material fact that the

employer's proffered reason for the adverse employment action is a pretext for retaliation, the

defendant is entitled to summary judgment.  *Potts v. United Parcel Serv.*, 3:11-CV-2407-L, 2013

WL 4483080, at *9 (N.D. Tex. Aug. 22, 2013) (Lindsay, J.) (citing *McCoy*, 492 F.3d at 560).  If

the plaintiff succeeds in making a prima facie case of retaliation, the burden shifts to the

employer to provide a legitimate, non-retaliatory reason for the adverse employment action.

*Hockman*, 407 F.3d at 330.  If the employer succeeds in doing so, the plaintiff must show that the

employer's reason for its action was merely a pretext for retaliation.  *McDonnell Douglas*, 411

U.S. at 804.

      Here, considering the evidence in the light most favorable to Plaintiff's claims, he

assisted in protected activity by filing a sexual harassment report on behalf of Patricia Major.

(Doc. 20-2 at 58-59).  Plaintiff purportedly filed the report with Sajan Thomas on May 5, 2011,

recounting Major's description of two incidents in April 2011 when the Third Shift Supervisor

allegedly directed lewd and sexually-suggestive comments and gestures toward her.  (Doc. 20-4

at 31).  Plaintiff claims that Varner subsequently began to "paper" his file in order to build a case

for Plaintiff's termination.  (Doc. 23 at 17).  Plaintiff has wholly failed, however, to offer any

evidence of a causal link between the protected activity on May 11, 2011, and his termination

which occurred some five months later on October 5, 2011.

Indeed, Plaintiff indicated at his deposition that the events leading to his termination were

unrelated to reporting the sexual harassment allegations:

> He [Varner] retaliated against me because – his thing is to get rid of me
> because I bring up so many – I cause so many problems for him.  One is that – the
> employees.  I talked to him about the type of employee he hires.  We have
> employees who don't have high school diplomas and – I'll say one, that I know
> of.  One underaged – that was underaged.  He's probably 21 by now; may not be.
>
> ***
>
> Oh, he [Varner] just wanted me out of there because he wanted another
> type of person in there.  He wanted another type of person in there that would
> have his back.

(Doc. 20-3 at 49, 57).[1]

And subsequently describing the September 29, 2011 meeting between Varner and

himself, Plaintiff attributed the problems precipitating his termination to his complaints about

Varner's poor management:

> Yes.  He [Varner] told me I was the problem, and I said: Well, no Les.  I
> said: You're the problem.  Everybody says that you're the problem at the account.

---

[1]  This is similar to allegations Plaintiff made in his July 1, 2010 letter response to his
performance evaluation (months prior to Varner promoting him to the position vacated by
Lamb):

> I believe Varner has harassed me for trying to carry out the policies and
> procedures of AlliedBarton and the Equity Office management.  Varner has not
> shown respect for supervisors by ignoring previous write-ups of employees who
> refuse to abide [sic] policies and procedures; by the lack of notice of new
> employees coming to the work site for training; by the favorable treatment of the
> hourly paid supervisor with paid holiday days off; and by allowing some
> employees to come to work early and leave early while others are denied the same
> privilege.  These actions on the part of Director of Security Varner has [sic]
> contributed to poor morale in the workplace.

(Doc. 20-5 at 24).

> He got mad, angry.  Then that's when all this stuff started, after that,
> because – and I said it to him just like that, because I – I never talked to him in a
> rough way.  Never talked to anyone at the job in a rough way; was always
> professional.  My performance appraisal as a supervisor – which you haven't seen
> yet, but it will show that.  And I have never had any complaints until after that
> meeting, and that's when everything started to blow up.

(Doc. 20-2 at 75; Doc. 20-3 at 1-2).  The following day, a heated discussion between Plaintiff

and Varner took place in Varner's office regarding the dropped telephone call between the two,

and Plaintiff was subsequently suspended.   (Doc. 20-3 at 20).  The parties dispute whether

Plaintiff's hands were waving or clenched during the argument.  (*Id.* at 18; Doc. 20-5 at 60).

Moreover, Defendants rely on email exchanges between Varner, Thomas, and James

Santti on May 24 and 25, 2011, to establish that Plaintiff did not follow proper procedure and

engaged in disruptive behavior.  (Doc. 23 at 50, 52).  Additionally, in an email message dated

September 29, 2011, Varner indicated that three security officers -- including Patricia Major --

had expressed concerns to Varner about Plaintiff's behavior as a supervisor.  *Id.* at 54.  Varner

noted that he discussed the charges with Plaintiff at their September 29, 2011 meeting, and

subsequently reported this alleged conduct to Thomas, who conducted an investigation.  (*Id.*;

Doc. 20-5 at 60).

Considering the evidence as a whole, in the light most favorable to Plaintiff claims, and

giving Plaintiff all deference due a *pro se* litigant, he has failed to offer any "proof that the

unlawful retaliation would not have occurred in the absence of the alleged wrongful action or

actions of the employer."  *Nassar*, 570 U.S. at ___, 133 S. Ct. at 2533.  That is, Plaintiff has not

shown that he was terminated in retaliation for reporting the alleged sexual harassment of his co-

worker.  Consequently, he has failed to meet his burden of establishing a prima facie claim of

retaliation.  Thus, Defendants' motion for summary judgment should be granted as to Plaintiff's

retaliation claim as well.

### III. CONCLUSION

The Court **RECOMMENDS** that Defendants' *Motion for Summary Judgment* (Doc. 20)

be **GRANTED** on all pending claims.

**SIGNED** September 5, 2013.

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE